**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

**CIVIL ACTION NO:  4:06-1042**

CANDICE MICHELLE HARDWICK
by and through her Parents and Guardians
DARYL LEWIS HARDWICK and
PRISCILLA LEA HARDWICK;

                 Plaintiffs,

     vs.

MARTHA HEYWARD in her individual capacity
and in her official capacity as Principal of Latta
Middle School;

GEORGE H. LIEBENROOD, JR., in his
individual capacity and in his official capacity as
Principal of Latta High School, and the

BOARD OF TRUSTEES OF LATTA SCHOOL
DISTRICT (Dillon County No.3),

                 Defendants.

**AMENDED MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY**
**INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT**:**

      The exhibits attached to this memorandum are identical and numbered exactly as in the Original

Complaint (and Plaintiff's First Amended Complaint) from "A" through "Z, " and with the facts

alleged in the Complaint are adopted, referenced  and incorporated into this Memorandum for all

purposes.

–1–

## FACTUAL BACKGROUND

Plaintiff, Candice Michelle Hardwick, resides in Latta, Dillon County South Carolina with her parents, Daryl Lewis and Priscilla Lea Hardwick, and has lived in South Carolina for most of her young life.  Candice is sixteen years old  and will be a junior this fall  at Latta High School where she is a member of the girl's track and basketball teams, the marching band, Future Farmers of America, and Student Court.   After graduation, Candice hopes to attend USC and study veterinary science or history.  Candice is an old-fashioned patriot who dearly loves her God, her Family, her community, her region and her nation.   The Hardwick Family has served South Carolina and our Nation for many generations and Candice's brother James is currently a Specialist in the United States Army and assigned to Tikrit, Iraq. Candice is a member of the Order of Confederate Rose and attends meetings of the Sons of Confederate Veterans with her Father and Mother.   Candice has attended Veteran memorials, helped to clean graves and helped out at the local War Between the States Reenactment.. Without any diminution in their love and loyalty to our Nation, Candice and her Family consider themselves to be Confederate Southern Americans, a unique and distinct remnant of the Southern people, with shared values, culture, music, and folkways.   A civil rights attorney might tell you that another word for such a "People" is a national origin group as that term is used in the Civil rights act of 1964, but alas,  despite the best efforts of their lone counsel, Confederate Southern Americans are judicially unrecognized as a national origin group by the 4th Circuit United States Court of Appeals and other federal courts. Candice views the Confederate Battle flag as a venerated symbol of her ancestry, her region and her Christian religious faith.

–2–

Before the spring of 2003, Candice freely wore Dixie Outfitter tee shirts and other shirts displaying the Confederate Battle flag to Latta Middle School with no interference from school officials. However, from the Spring of 2003, until May 2005, at Latta Middle School and September 2005, at Latta High School, Candice has been made to remove innocent shirts in good taste, mostly produced by the Dixie Outfitter Company, in the face of no apparent disruption in the school. Candice has been told repeatedly by school officials that the offending symbol on all of these shirts is the Confederate Battle flag or some variation thereof. Besides the Confederate Battle flag, the theme of these shirts have included little chicks (Exhibit "D"), "Dixie Angels" (Exhibit "E"), A Confederate Rose (Exhibit "F"), Black Confederates (Exhibit "G"), Gen. Robert E. Lee (Exhibit "I"), a basketball (exhibit "J"), and Daddy's little redneck (Exhibit "Q"). From 2004 to the present, public dissent from the ban on Confederate symbols has not been tolerated by either Defendant Heyward at the Middle School or Liebenrood at the High School. None of the protest shirts worn (or attempted to be worn by Candice or others) displayed the Confederate Battle flag, so presumably these shirts were banned because of their speech content alone. The shirts involved had the following messages:

OLD GLORY FLEW OVER LEGALIZED SLAVERY FOR 90 YEARS (with a depiction of the flag of the United States) (Exhibit "H");

OFFICIAL SCHOOL POLICY - DIVERSITY AND TOLERANCE - for all Cultures (except Southerners) (Exhibit "K");

OFFENDED BY SCHOOL CENSORSHIP Of SOUTHERN HERITAGE (Exhibit "M");

JESUS AND THE CONFEDERATE BATTLE FLAG - Banned from our Schools, But forever in our hearts (Exhibit "R");

HONORARY MEMBER of the FBI (Federal Bigot Institutions) (Exhibit "S");

OUR SCHOOL SUPPORTS FREEDOM OF SPEECH for ALL (except Southerners) (Exhibit "T");

PUBLIC SCHOOL SHOULD EDUCATE NOT DISCRIMINATE AGAINST SOUTHERN HERITAGE (Exhibit "U").

Even a shirt bearing a photograph of the Confederate Monument and flag in front of the Statehouse in Columbia is banned at Latta High School by Defendant Liebenrood.

When Plaintiff and others asked why the flag was banned they were told by Heyward, Liebenrood and other school officials that some (always anonymous) people were offended by Confederate symbols and believed the flag was a symbol of racism. Plaintiff's Mother was told by Heyward that it took longer for classes to "settle down" when Candice wore her shirts.

Candice was punished in February 2004 for wearing a Confederate tee shirt by being sent to ISS or In School Suspension for the rest of the day and was denied the chance to eat lunch. Candice has been verbally berated and harangued - to the point of being put in tears, told to partially disrobe in order to change shirts, threatened with expulsion from the track team. During this two- and-half year campaign against her rights Candice has always been firm in stating that the acts of Heyward and Liebenrood and the Board of Trustees was a violation of her rights, but that for the most part she has politely and respectfully complied with these unnecessary and unconstitutional requests. When she has refused to comply she has done so politely and with the backing and full support of her parents and

–4–

based on her firm conviction that the Principals' directives were a violation of her rights. Candice is not a rebel trying to defy a Principal's authority. Candice is trying to test the limits of injustice and put the hypocrisy and double standard's of school officials in the light where all can see. In this way Candice's fellow students can learn the necessity of vigilance in preservation of the rights of the people, including students of Confederate ancestry.

Latta Middle & High School students were and are permitted to wear clothing bearing other expressions of their viewpoints including items containing words and/or images referring to Malcolm X, FUBU, gang members, Rock stars, sports stars, Gothic, candidates for political office, and other expressions of political or controversial significance. The only symbol specifically prohibited is the "Confederate Battle flag" and including any shirts protesting said prohibition. Other students also disregard other provisions of the dress code, and go unpunished for such things as boxer shorts showing, trousers worn too low, belly buttons showing as well as sexually explicit, illegal drugs and alcohol-themed tee shirts.

No material or substantial disruptions of the learning environment at Latta Middle or High School have occurred based on plaintiff's wearing her tee shirt bearing the flag, which is significant considering that her attempts for sanity and fairness in the application of the Latta School dress policies has been going on since 2003. Candice's stand has kindled significant support for her among African American students in Latta Schools, who make up close to a majority of the School District's population. Candice has African American friends who support her fight for free speech, because they know it affects their own rights and the rights of all students that attend Latta Schools.

On information and belief, the prohibition on "items displaying the Confederate Battle flag" was instituted while Candice was in the 7th grade during the 2002-2003 school year by Latta Middle School Principal Martha Heyward and her decision was ratified by the Latta School's Board of Trustees, on information and belief sometime in the Spring of 2004. Latta High School Principal George Liebenrood extended the ban on Confederate symbols to students in the High school at the start of the 2004-2005 school year when Candice was a freshman and on information and belief this decision was also ratified by the Board.

Before the Spring of 2003, students wore items displaying the flag to both Middle and High School without incident. Several other schools outside the District, but within Dillon County, do not ban the flag.

The flag is not inherently racist, yet it is being banned because of institutionalized school bias and prejudiced perceptions that the flag can only be viewed as a symbol of racism.

On April 12, 2004, Plaintiff's parents sent a letter (Exhibit "L") to the Superintendent, Dr. John Kirby, objecting to the ban on the flag as view point based discrimination in violation of Candice's First Amendment rights among others rights. The Hardwicks went to some pains to request factual information on the underlying "disruption" alleged by Principal Heyward. Plaintiffs also stressed that the Confederate flag had ancestral and religious significance to Candice and specifically requested an accommodation for her religious beliefs. The Hardwicks asked that Latta Schools review and correct any disciplinary actions against Candice for wearing shirts bearing images of the flag and revise its policies to ensure that students' free speech rights were protected and suggested that Black Confederate activist, H.K. Edgerton, be brought in to teach a tolerance seminar on Confederate

symbols to give school officials a comfort level in restoring the flag to the school. Guides to Confederate Issues in North Carolina, Alabama and Kentucky were attached as models for a South Carolina Guide and as suggested teaching aids for any future seminar agreed on.

A reply (Exhibit "N") dated May 12, 2004 from Board Chairman Harold Kornblut focused on the segregated past of Dillon County, a time well before Candice was born, but somehow in Kornblut's view impels the sacrifice of Candice's rights. Mr. Kornblut further alluded to racial tensions at Latta High School that took place about the time Candice was born. Kornblut vindicated Heyward's judgment in banning the flag at the Middle School by reference to hyped verbal exchange between a student and Principal Liebenrood. In that exchange the High School student allegedly used a racial pejorative in his conversation with the principal (which did not happen). Kornblut then compared banning the flag with the need to ban symbols that promote drugs, liquor, beer, and violence, noting that the Ku Klux Klan uses the Confederate Battle flag (note: just as it uses the Christian flag and the US flag) . Based on these reasons, Kornblut concluded that Heyward had a "specific and significant fear of disruption" to justify banning the flag. at the High School." Though requested, no mention was made of any substantial disruption caused by students' displaying Confederate/protest symbols on clothing. Nor did the letter recognize that the flag might have any other symbolic or expressive meaning other than that assumed by the school.

The Hardwicks requested by letter (Exhibit "O") a reconsideration November 10, 2004, re-requested specific facts of current disruption that would justify a ban on Confederate symbols, re-urged the families ancestral and Christian ties to the flag, re-requested a religious accommodation and re-urged an educational tolerance teaching seminar as a means to bring the Confederate flag back into

the schools. Kornblut responded (Exhibit "P") on December 17, 2004 with substantially the same failure to cite any significant current disruption, failed to respond to any of the Hardwick's questions, statements or suggestions for an amicable resolution of a problem created by school officials.

Through counsel the Hardwicks requested and were denied (Exhibits "W" and "W-1")  a hearing before the Board and,  exhibiting the patience of Job,  sent a final letter to counsel for the Board on February 10, 2006 (see Exhibits "X," "X-1" and "X-2") which was finally answered on March 24, 2006.  (Exhibit "Y"). The letter denied that protest shirts were banned, but that they would henceforth be allowed and the Board finally responded to the Hardwick's request for religious accommodation, while denying her any meaningful accommodation without further submissions from Candice on her beliefs (an offer first made by the Hardwick's back in May of 2004).   When Candice attempted to wear a dissent shirt to school shortly after her parent's receipt of Exhibit Y, she was made to change her shirt by school officials.

Latta Middle School policy statement states:

"Generally student dress is considered appropriate as long as it does not distract others, interfere with the instructional programs, or otherwise cause disruption."

Number 9 of the Dress code states:

"Students may not wear clothing that displays profane language, drugs, tobacco, or alcohol advertisements, sexual innuendoes or anything else deemed to be offensive." (See Exhibit "A").

Nothing in the dress code, given to students or parents, prohibits the wearing of Confederate symbols on student clothing.

The pertinent and applicable dress code for Latta High School for the 2004-2005 and 2005-2006 School year states:

> "Latta High School students are to come to school in a neat and clean manner each day.  Dress is casual, but some styles, which may be appropriate outside of school, are clearly inappropriate for school..." (see Exhibits "B" and "C").

Nothing in the dress code of either school year,  given to students or parents, specifically or vaguely prohibits the wearing of Confederate symbols on student clothing.

Plaintiff has never asserted a racially-hostile attitude in wearing her  shirts, but is expressing her  pride in her Confederate and Christian heritage or based on deep and personal conviction, her dissent to the School's unconstitutional actions towards her and other students of Confederate ancestry - and through that community the basic free speech rights of all students that attend Latta Schools.

## ARGUMENT

### First Amendment Violation

The action taken by Defendants against Plaintiff constitutes viewpoint discrimination in violation of her First Amendment right to free expression in the public school setting. Plaintiff seeks to vindicate her rights and remedy the wrongs done to her through this lawsuit. Plaintiffs do not request preliminary relief for their Ninth Amendment claim.

Without the intervention of this Court, Plaintiff will be prevented from exercising her constitutionally protected right to free expression that was guaranteed to her and other American public school students by the United States Supreme Court's landmark decision in *Tinker v. Des Moines Independent Community School District*. (393 U.S. 503(1969). The Supreme Court has been

–9–

crystal clear: like the students in *Tinker*, Plaintiff is not required to "shed [her] constitutional rights to freedom of speech or expression at the school house gate." Id. At 506.

Fourth Circuit precedent indicates that this analysis of the present case under *Tinker* is appropriate. See *Newsom v. Albemarle County Sch. Bd.* 354 F.3d 249, 257 (4th Cir. 2003). In *Newsom*, a student asked the court to enjoin enforcement of a school dress code banning messages relating to weapons. After considering the applicability of other student speech cases decided by the Supreme Court *(Bethel School District. No 403 v. Fraser,* 478 U.S. 675 (1986) and *Hazelwood Sch. Dist. V. Kuhlmeier,* 484 U.S. 260), the Fourth Circuit concluded that "…*Tinker* is the most relevant of the three Supreme Court cases concerning school speech and sets forth the legal framework that we will use in our overbreadth analysis." *Newsom* at 257.

Defendants' application of school policy constitutes an egregious violation of Plaintiff's First Amendment right to free expression. Plaintiff therefore asks this Court to enter a preliminary injunction ordering Defendants to cease interfering with Plaintiff's and other students' constitutionally protected right to express themselves through attire that reflects their political, community, ancestral and religious beliefs.

Cases where the Confederate flag in school has been an issue establish, without question, that the flag alone is not offensive. In order to prohibit the flag there must be a showing of or a reasonable apprehension of disruption.

The case at bar is remarkably similar to *Castorina v. Madison County School Board*, 246 F.3d 536 (6th Cir. 2001). The Sixth Circuit found no factual basis for the prohibition on the wearing of the Confederate Battle flag. The prohibition herein has none either.  It is however, unconstitutional

viewpoint discrimination.

The facts herein are as strong, or stronger, than *Castorina*. Here, plaintiff wore (or attempted to wear) her shirts, including protest shirts without the banned symbol on numerous occasions without incident and is still punished by a facially unconstitutional policy. The disruption, if any, is caused by the acts of school officials and teachers, not Candice or her Confederate Battle flag/protest shirts. She is entitled to injunctive relief. The current interpretation of the policy concludes, as enunciated by Mr. Kornblut, without exception, that the Confederate flag, a symbol of our history, is defacto racist and deserving to be treated on a par with profanity and vulgarity. Plaintiff's experience and her desires speak to the contrary.  She can only be precluded from wearing the shirt if it disrupts the school environment, *Tinker*.

In *West v. Derby Unified School District*, 206 F.3d 1358 (10th Cir. 2000), the flag was prohibited because there were numerous racial incidents and the prohibition was in response thereto. In *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972), there was so much disorder and disruption (the school was closed twice) that the prohibition was upheld.  In *Scott v. School Board of Alachua County*, 324 F.3d 1246 (11th Cir. 2003) officials presented evidence of racial tension and fights which justified the ban on the flag. In *Phillip v. Anderson County*, 987 F.Supp. 488 (U.S.D.C. South Carolina, 1997), the prohibition was upheld based upon proof of five incidents related to or caused ***by*** the Confederate flag.

Obviously, the cases where the prohibition was upheld related to disruption or a well-founded basis for believing same would occur and each court was careful and reluctant to suppress speech without a significant factual showing.

Here, all we have so far is an assertion from the Board's Chairman, that because of past

–11–

wrongs along with one bogus racial epithet used anonymously in a talk with a principal, and the fact *some* Klansman *somewhere* has carried a Confederate flag; therefore they fear a disruption of discipline. We urge this Court to rule along with the mainstream that such fear, based upon such a tenuous argument, does not justify the ban and prohibition which is before this Court.

No scenario can justify the blanket ban on the flag in the implementation of the School District's dress code policy and the stated presumption of its racism.

### Fourteenth Amendment Due Process Violation

The manner in which the school dress code has been enforced also clearly violates Candice Hardwick's fundamental right to due process of law. The code is so vague and lacking in proper standards for enforcement that it leaves to the unfettered discretion of school administrators the prerogative of banning student clothing on any basis that they may individually deem to be offensive. Thus school officials are empowered to suppress student clothing and whatever messages maybe inscribed thereon simply because any of them may not agree with and may positively dislike the viewpoint expressed. On the other hand, they can abstain from punishing putative violations of the dress code if the message is one of which they approve or to which they are indifferent.

Vesting any government authority or official with such broad power clearly traduces the due process rights of the Plaintiff as well as other students at the Latta schools.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined (cit.) A challenged statutory provision will survive scrutiny unless it is so unclear with regard to what conduct is prohibited that it may trap the innocent by not providing for

–12–

warning, or it is so standardless that it enables arbitrary and discriminatory enforcement. *South Carolina Medical Association v. Thompson*, 327 F. 3d 36, 354 (4th Cir. 2003)**.**   Moreover, "the required degree of clarity is particularly stringent where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Richmond Medical Center for Women v. Gilmore*, 55 F. Supp. 2d 441, 494 (E.D. Va. 1999).

It is true that a school district's student conduct code need not define forbidden behavior with mathematical precision or with the exactitude of a criminal statute.   *Coy ex rel Coy v. Board of Education of Canton City*, 205 F. Supp 2d 791, 802-803 (ND Ohio 2002)   Nevertheless the terms and wording of the code upon which the officials relied in disciplining Candice Hardwick are clearly vague and ambiguous to the extent that it "invites arbitrary, discriminatory and overzealous enforcement" and therefore its enforcement against her clearly violated - and continues to violate - her due process rights.  205 F. Supp. 2d at 802.


### Fourteenth Amendment Equal Protection Violation

In a similar vein the manner in which the dress code has been enforced against her violates her Fourteenth Amendment right to equal protection of the laws.  She has clearly been treated differently and more severely because of her political and social views than have other students who have violated the code in the same manner.  She therefore has a valid cause of action against such discrimination:

> **A plaintiff can utilize section 1983 to gain a private right of action for a violation of the plaintiff's constitutional rights when unequal administration of a state statute demonstrates intentional or purposeful discrimination.**

*Eberhart v. Gettys*, 215 F. Supp. 2d 666, 675 (MD N.C. 2002)  The plaintiff can seek such relief against purposeful mistreatment even though she may represent a "class of one" in circumstances of

–13–

this kind. *Willis v. Town of Marshall, N.C.*, 426 F. 3d 251, 263 (4th Cir 2005).

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

To obtain a temporary restraining order or a preliminary injunction in federal court, the movant has the burden of establishing

"(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest*." Direx Israel, Ltd. V. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1992).

Here, as in *Newsom*, "the irreparable harm that [plaintiff] has alleged is inseparably linked to his claim of a violation of his First Amendment rights." *Newsom v. Albemarle County Sch. Bd.,* 354 F.3d 249, 254 (4th Cir. 2003). Thus, Plaintiff turns first to her likelihood of success on the merits.

**1.      There is a substantial likelihood that Plaintiffs will succeed on the merits of their case.**

The First Amendment to the United States Constitution provides that "Congress shall make no law…abridging the freedom of speech." U.S. CONST. amend. 1.  While the Supreme Court has recognized public school officials' authority to "prescribe and control [student] conduct," the protections of the First Amendment extend to students in the public schools. *Tinker,* 393 U.S. at 506, 507. Students may express their views freely, so long as their chosen mode of expression does not cause "material and substantial interference with schoolwork and discipline." *Id*. At 511.  A school

–14–

administrator's fear of disruption or interferences must have a genuine basis in fact - "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id*. at 508. Furthermore, the censorship of a particular opinion is not constitutionally permissible in the public school setting. *Id*. at 511.

In *Tinker*, the Court overruled a public school's ban on students wearing black armbands to protest the Vietnam War. The Court held that, despite the intense emotional controversy surrounding the war and students' dissent against it - a former student of the high school had been killed in the war - school authorities could not have reasonably anticipated that wearing black armbands in protest of the war in class would materially and substantially disrupt the operation of the school or interfere with the rights of others. *Id*. at 514. In fact, the Court emphasized that the students engaged in "silent, passive expression" that generated discussion, but did not provoke disorder or an interference with the school's work. While some students were unreceptive to the armbands and some "made hostile remarks" regarding the armbands, the Court noted that there were "no threats or acts of violence on school premises." *Id*. at 508. In the end, the Court found that the school officials' ban was an unconstitutional suppression of a particular opinion. "Students in school…may not be confined to the expression of those sentiments that are officially approved." *Id*. at 511.

Students' use of clothing as a "silent, passive" medium for personal expression is not new, nor is it controversial. Other Federal Courts have upheld the rights of students to express their political views by wearing attire that conveys a message that others might deem controversial or unpopular. See, e.g., *Castorina v. Madison County School Board*, 246 F.3d 536 (6th Cir. 2001) (tee shirt depicting Confederate flag); *Chambers v. Babbitt*, 145F. Supp. 2d 1068 (D. Minn. 2001) (sweatshirt emblazoned with message "Straight Pride"); *Barber v. Dearborn Public Schools*, 286 F. Supp. 2d

–15–

847 (E.D. Mich. 2003) (tee shirt with picture of President Bush with caption "International Terrorist")

In *Castorina* the Court considered at length the constitutionality of Confederate flag tee shirts worn by students at school. In that case, the plaintiffs were twice suspended for wearing tee shirts that displayed the Confederate flag and the words "Southern Thunder." The school's dress code banned the wearing of any clothing or emblems with, among other things, "illegal, immoral, or racist implication." *Castorina*, 246 F.3d at 538. After considering the evidence, the Court reversed the district court's grant of summary judgment to the school, remanding to the lower court for resolution of factual equal protection issues and stating that without a showing of disruption as a result of the students' wearing tee shirts displaying the flag, their suspension must be struck down. See also *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 211 (3rd Cir. 2001) ("*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance"); *Newsom v. Albemarle County Sch. Board*, 354 F.3d 249, 260 (4th Cir. 2003) (strong likelihood of success on the merits where no evidence presented that clothing bearing messages related to weapons "never substantially disrupted school operations or interfered with the rights of others") *Chandler v. McMinnville School District*, 978 F.2d 524 (9th Cir. 1992) ("scab" buttons worn by middle school students during a strike not shown to be "inherently disruptive") *Clark v. Dallas Independent School District*, 806 F. Supp. 116 (N.D. Tex. 1992) (despite some students' objections, absent material and substantial disruption school could not prohibit students from distributing religious tracts on school grounds).

Here, the school's restriction on Plaintiff's expression was unequivocally opinion suppression and viewpoint discrimination - conduct the Supreme Court has deemed unconstitutional. Plaintiff's

tee shirt did not disrupt class work or other school activities, nor is there any evidence that the shirt intruded upon the rights of others "to be secure and to be let alone." *Tinker*, 393 U.S. at 508.

In addition, other students at Latta Middle and  High School have been permitted, if not encouraged, to express their political viewpoints. Students have worn clothing bearing images or messages relating to Malcolm X, FUBU (For Us By Us), Marilyn Manson, Anti-Christ, rock stars, sports stars, Gothic, candidates for political office, and other expressions of political or controversial significance. Thus, there is no question that some, but not all, Latta Middle and  High School students are permitted to engage in constitutionally protected personal expression every day.

Defendants have crossed the constitutional line by designating "appropriate" viewpoints and suppressing dissent, while forbidding student dialogue regarding "offensive" viewpoints. The Constitution and the Supreme Court simply do not permit this; the law in the United States is that students are permitted to express their point of view, no matter how controversial, no matter how unpopular, without pre-approval by school faculty or administration so long as the expression does not cause a substantial disruption.

As in *Tinker*, the school administrators here acted on an "undifferentiated fear or apprehension of disturbance. *Id*.  The Court in *Tinker* expressly rejected avoidance of controversy as a basis to restrict students speech. *Id*. at 509.

Candice is not asking school officials to agree with her views and embrace the Confederate flag; she simply wants them to honor her and other students' constitutionally protected right to express their views freely and without incident. If Plaintiff's tee shirt invites conversation, or even sparks a heated dialogue, it is this very discourse that the Supreme Court envisioned and vigorously protected in *Tinker*. Other students are entitled to disagree with Plaintiff's message and express themselves accordingly in a non-disruptive manner. That is every student's right. Schools need to understand that

if they run their schools like a Gulag, the students who graduate will be ill prepared for the responsibilities of citizenship. The Supreme Court and Plaintiff recognize this point. Now it is time for the school district to do the same.

Plaintiff recognizes that Latta Schools and the Board has an important interest in ensuring the safety and discipline of its students and retains discretion to regulate student conduct to ensure that those goals are met. The school's interest in safety and discipline, however, does not justify imposing a restraint on Plaintiff's expression absent evidence that her speech will cause, or did cause, a material disruption to school order.  Defendants have provided no such justification to Plaintiff, and indeed there is none. Defendants' conduct violates the First Amendment, and this Court should enjoin it.

**2.  Plaintiff is suffering and will continue to suffer irreparable injury unless this Court issues an injunction.**

Defendants have prohibited Plaintiff from expressing herself through clothing that reveals her pride in her Confederate ancestry and  heritage by a depiction of the Confederate flag. Plaintiff has patiently waited for almost three years for relief and her family has tried to motivate the Defendant's to work with them towards an amicable resolution without litigation.  If the Court does not enter a preliminary injunction, then Defendants will have successfully prevented Plaintiff from exercising her First Amendment right to freedom of speech. Two more years when Candice has graduated and the Defendants will have "cycled out" their problem. Plaintiff's choice of clothing is protected as "speech" and "expression." *Tinker,* 393 U.S. at 506 (holding that wearing an armband for purpose of expressing certain views is a type of symbolic act that is within the free speech clause of the First Amendment). "Symbolic acts constitute expression if the actor's intent to convey a particularized message is likely to be understood by those perceiving the message." *Doe v. Yunits*, 2000 WL 33162199 (Mass. Super. Ct.

Oct. 11, 2000), citing *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (holding that an inverted flag with a peace symbol attached to it conveys a message that others likely understood and constituted free speech),and *Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F. Supp. 659 (S.D. Tex. 1998) (ruling that students wearing rosary beads as a sign of religious belief constitutes protected speech because others likely understood the message).

Plaintiff can establish an irreparable injury merely by demonstrating that her First Amendment rights have been violated. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time unquestionably constitutes irreparable harm.") see also *Beussink v. Woodland R-IV School District.*, 30 F. Supp. 2d 1175, 1180 (E.D. Mo. 1998) ("Irreparable harm is established any time a movant's First Amendment rights are violated."). Plaintiff's constitutional right to free expression will continue to be infringed upon if she is not permitted to wear clothing that expresses her legitimate pride in her Southern heritage. Such injury is serious and irreparable.

Unless this Court enters a preliminary injunction requiring Defendants to cease selectively enforcing school policy and arbitrarily prohibiting Plaintiff from wearing clothing that reveals her political, community, ancestral and religious beliefs, Plaintiff will be unable to exercise her constitutionally protected right to free expression. Preliminary relief is essential to safeguard Plaintiff's constitutional rights during the pendency of these proceedings. See *McCormack v. Township of Clinton,* 872 F. Supp. 1320 (D.N.J. 1994) (noticing that the "equities weigh exclusively in plaintiff's favor" in free speech case).

**3.      The threatened and continuing injury to Plaintiff vastly outweighs whatever damage the Preliminary Injunction might cause Defendants.**

Conversely, Defendants cannot show that the entry of a Preliminary Injunction by this Court will damage them in any way. There is no evidence that Plaintiff's choice of apparel has caused or will cause any disruption to the discipline or daily routine of Latta High School. Almost three years of contention over the issue, that shows no sign of going away, in schools where African American students are almost a majority, is strong evidence that the flag has not caused and will not cause a disruption, nor will it in the future. In fact, there are students at Latta High School who express other political and religious messages every day without incident. Most importantly, there is no evidence that Plaintiff's choice of clothing has interfered with school discipline, has infringed upon any other student's rights, or has put her or any of her classmates in danger. A Preliminary Injunction in this case will not prevent Defendants from evenhandedly enforcing school policies.

### 4. The Preliminary Injunction is not adverse to the public interest.

The injunctive relief sought by Plaintiff in this case is not adverse to the public interest. As noted above, Plaintiff's right to use clothing as a means of personal expression will not create a school safety or discipline problem. Defendants' pattern of refusal to permit students of Confederate ancestry to express themselves as permitted by the First Amendment is contrary to the fundamental ideals for which so many of our gallant soldiers fought and died and which Plaintiff's brother is fighting for right now half a world away in Iraq. Defendants' actions not only have offended Plaintiff, they have offended the Constitution and the People of the United States.

It is clear that the Court's entry of the proposed Preliminary Injunction will further the unquestionable public interest in the dissemination of and exposure to different ideas. As the Supreme Court has noted, "[t]he classroom is peculiarly the "marketplace of ideas. The nation's future depends upon leaders trained through exposure to that robust exchange of ideas…" *Keyishian v. Board of*

*Regents*, 385 U.S. 589, 603 (1967) (citations omitted). "Surely, upholding constitutional rights serves the public interest." *Newsom,* 354 F.3d at 260.

Plaintiff's chosen statement and medium of expression is entitled to constitutional protection. It is within society's best interest for this Court to carefully guard the constitutional and legal rights of its members – regardless of age or point of view.

## CONCLUSION

Twenty-six years before *Tinker v. Des Moines Ind'l School District*, 393 U. S. 503 (1969) and forty-three years before *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986) there was *West Virginia State Board of Education v. Barnette*, 319 U. S. 624 (1943). In that decision, handed down in the midst of World War II, the bloodiest conflict in which this nation has ever been involved, the United States Supreme Court reiterated and confirmed the basic First Amendment right of freedom of expression in terms that are directly applicable to these  proceedings:

> We can have intellectual individualism and the rich cultural diversity that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes.  When they are so harmless to others or to the states as those we deal with here, the price is not too great.  But freedom to differ is not limited to things that do not matter much.  That would be a mere shadow of freedom.  The test of its substance is the right to differ as to things that touch the heart of the existing order.
>
> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in

–21–

politics, nationalism, religion or other matters of opinion or force

citizens to confess by word or act their faith therein.

319 U.S. at 641-642.

Significantly the United States Supreme Court issued this opinion in defense of the First Amendment rights of a public school student during wartime - when the coercive influences in society impelling unity - and thus conformity -are typically at their height. This fact has great importance for the manner in which this honorable court should view the competing interests in this case.

By her Motion for Preliminary Injunction, Candice asks only that Defendants and other school officials honor her constitutionally protected right to free expression by wearing attire that expresses her views and personhood. The facts of this case fall in Plaintiff's favor. Consistently, other students have been permitted to display messages that express political and religious sentiments without incident. Defendants' violation of Plaintiff's right to free expression cannot be justified.

In so moving, Plaintiff has met her burden. She has demonstrated that she will likely prevail upon the merits of this case at trial; and that she has endured an ongoing and long lasting irreparable injury; that his irreparable injury vastly outweighs whatever harm Defendants might suffer by the entry of the Preliminary Injunction; and that the injunction will serve the public interest.

Plaintiff asks this Court to enter a Preliminary Injunction requiring Defendants to cease prohibiting Plaintiff from wearing clothing that expresses her deeply held beliefs, including pride in her Confederate ancestry, and for such other relief as this Court deems just and equitable.

## **VERIFICATION**

I have read the foregoing Motion and hereby certify that the aforementioned pleading is true and

accurate to the best of my information and belief.  I so swear under the penalties of perjury.

Candice Michelle Hardwick, Plaintiff

Daryl L. Hardwick, Parent and Guardian

Priscilla Lea Hardwick, Parent and Guardian

This 6TH day of July 2006.

Respectfully submitted,

LAW OFFICES OF LOURIE A.  SALLEY, III
101 East Main Street
Lexington, SC 29072
Telephone: 803- 957-1036
Facsimile:  803- 957-8477
Email: salleylaw@bellsouth.net

By: S/ LOURIE A. SALLEY, III
LOURIE A. SALLEY, III
Attorney at Law
Federal Admission Number: 4792

SOUTHERN LEGAL RESOURCE CENTER, INC.
90 Church Street

P.O.Box 1235
Black Mountain, NC 28711
Telephone: 828-669-5189
Facsimile: 828-669-5191
Email: slrc@slrc-csa.org


By:___S/ KIRK DAVID LYONS___
KIRK DAVID LYONS, Esq., Pro Hac Vice
Attorney at Law
Federal Admission Number: 8472

**ATTORNEYS FOR PLAINTIFF**