IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| CANDICE MICHELLE HARDWICK, by and through her Parents and Guardians DARYL LEWIS HARDWICK and PRISCILLA LEA HARDWICK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 4:06-1042-TLW |
| MARTHA HEYWARD in her individual capacity and her official capacity as Principal of Latta Middle School, | ) ) ) ) | |
| GEORGE H. LIEBENROOD, JR., in his individual capacity and his official capacity as Principal of Latta High School, and the | ) ) ) ) | |
| BOARD OF TRUSTEES OF LATTA SCHOOL DISTRICT (Dillon County No. 3), | ) ) ) ) | |
| Defendants. | ) ) ) | |

# ORDER

The plaintiff, Candice Michelle Hardwick ("plaintiff"), by and through her parents, Daryl

Lewis Hardwick and Priscilla Lea Hardwick, instituted this lawsuit for damages and injunctive relief

against defendants Martha Heyward, in her individual capacity and her official capacity as Principal

of Latta Middle School; George H. Liebenrood, Jr., in his individual capacity and his official

capacity as Principal of Latta High School; and the Board of Trustees of Latta School District (Dillon

County No.3) ("defendants").  In her First Amended Complaint, the plaintiff alleges the following

causes of action: violation of her First Amendment right to freedom of speech and expression;

violation of her rights under the South Carolina Constitution; violation of her Fourteenth

Amendment right to due process of law; violation of her Fourteenth Amendment right to equal protection under the law; and violation of the reserved right to express heritage. (Am. Compl., Doc. #18). The plaintiff filed a motion for a preliminary injunction on September 15, 2006, (Doc. #32), to which the defendants responded on September 19, 2006. (Doc. #33). This Court held a hearing on the plaintiff's motion for injunctive relief on December 20, 2006. (Doc. #54). On January 22, 2007, this Court issued an Order denying the plaintiff's motion for injunctive relief. (Doc. #60). The plaintiff filed a notice of appeal.[1] (Doc #61). On October 19, 2007, the defendants filed a motion to dismiss the complaint. (Doc #82). On November 5, 2007, the plaintiff filed a response to the defendants' motion in which she agreed to dismiss Count Five of her First Amended Complaint (violation of the reserved right to express heritage). (Doc. #90). This Court issued an Order on July 14, 2008 denying the defendants' motion to dismiss, but noting the dismissal of Count Five of the First Amended Complaint. (Doc. #104).

This matter is now before the Court for resolution of the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) which was filed on June 8, 2009. (Doc. #120). On June 29, 2009, the plaintiff filed a response to the defendants' motion for summary judgment. (Doc. #134). The defendants filed a reply to the plaintiff's response on July 13, 2009. (Doc. #142). This Court held a hearing on this matter on July 31, 2009. (Doc. #148). This Court has carefully considered the motions, memoranda, affidavits, and exhibits submitted by the parties, as well as the arguments presented at the hearing. The Court has determined the relevant facts from the record presented by the parties and drawn all reasonable factual inferences in favor of the plaintiff as non-moving party.

---

[1] The notice of appeal was dismissed as moot on November 15, 2007.

## FACTS

The Latta School District comprises three public schools in Dillon County, South Carolina: Latta High School; Latta Middle School; and Latta Elementary School. The district's total student population of approximately 1,600 is divided nearly equally between students of Caucasian descent ("white") and students of African-American descent ("black"). (Kornblut Aff. 2). Plaintiff Candice Michelle Hardwick was a white student who attended Latta Middle School during the 2002-03 and 2003-04 school years and Latta High School during the 2004-05 and 2005-06 school years.[2] (Am. Compl., Doc. #18).

Both Latta Middle School and Latta High School publish student dress codes. The applicable student dress code for Latta Middle School during the time plaintiff attended provides, in pertinent part:

> Generally, student dress is considered appropriate as long as it does not distract others, interfere with the instructional programs, or otherwise cause disruption. Any type of clothing or grooming considered to be disruptive or inappropriate will be handled at the discretion of the administration.
> . . . .
>
> Following are some examples that are judged to be inappropriate or distracting in the educational setting; therefore they are not allowed.
> . . . .
>
> 9.  Students may not wear clothing that displays profane language, drugs, tobacco, or alcohol advertisements, sexual innuendoes or anything else deemed to be offensive.

(Pl.'s Ex. A, Doc. #1). The applicable student dress code for Latta High School during the time plaintiff attended provides, in pertinent part:

_____

[2] It also appears that the plaintiff attended Latta High School for a portion of the 2008-09 school year. (Doc. #120).

3

> Latta High School students are to come to school in a neat and clean manner each day. Dress is casual, but some styles, which may be appropriate outside of school, are clearly inappropriate for school. Students may not wear the following:
>
> . . . .
>
> Shirts with obscene/derogatory sayings.

(Pl.'s Ex. B, Doc. #1). Although neither dress code explicitly prohibited clothing that displayed images of the Confederate flag, defendant Liebenrood stated that Confederate flag symbols on clothing had been prohibited since he first arrived at Latta High School in 1980. (Liebenrood Dep. 15:13-20).

In her First Amended Complaint, the plaintiff alleges multiple instances in which she was asked to remove clothing that displayed the Confederate flag as a student of the Latta School District. (Am. Compl., Doc. #18). The plaintiff first alleges that in April 2003, while attending Latta Middle School, defendant Heyward asked her to remove a t-shirt that displayed the Confederate flag. (Am. Compl., Doc. #18). The plaintiff alleges several other instances during the 2003-04 school year where she was asked to remove or cover up t-shirts displaying the Confederate flag and, in one instance, was given in-school suspension ("ISS") for refusing to do so. (Compl., Doc. # 18). The plaintiff alleges at least three instances where she was asked to remove or cover up clothing displaying the Confederate flag while she attended Latta High School. (Am. Compl., Doc. #18). Additionally, the plaintiff alleges that defendant Liebenrood asked her to remove or cover up several t-shirts that protested Latta High School's ban on Confederate symbols.[3] The plaintiff also alleges

---

[3] These "protest" t-shirts did not actually display the Confederate flag (Pl.'s Ex. "H," "M," "U," "T," and "K," Doc. #1). Prior to this Court's resolution of the plaintiff's motion for a preliminary injunction (Doc. # 60), the defendants agreed to permit the plaintiff to wear these "protest" shirts. Therefore, these "protest" t-shirts are not in dispute, and thus, not before the Court at this time. This Order addresses only the t-shirts which display the Confederate flag in whole or part including plaintiff's exhibit "R" (Jesus and the Confederate Battle Flag) (Doc.#1).

4

that while attending Latta Middle School and Latta High School, other students were asked to cover up or remove t-shirts displaying the Confederate flag and t-shirts protesting the ban on Confederate symbols. (Am. Compl., Doc. #18). The Court has reviewed the shirts which the plaintiff was asked to remove. Photographs of the shirts at issue have been entered into the record. (Pl.'s Ex., Doc. #1). Each banned shirt displays the Confederate flag or a portion of the Confederate flag.

During this period, the plaintiff's parents issued several written requests to the defendant Board of Trustees of Latta School District asking the board to remove any disciplinary records the plaintiff compiled as a result of wearing the Confederate flag t-shirts and to reconsider its policy of banning clothing displaying images of the Confederate flag. The defendant Board of Trustees denied these requests. The plaintiff commenced this action on April 1, 2006, while a sophomore at Latta High School. (Compl., Doc. #1).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the defendants are entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As the party seeking summary judgment, the defendants bear the initial responsibility of informing this Court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This requires the defendants to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of genuine issues of material fact. Celotex, 477 U.S. at 323; see also

5

Anderson, 477 U.S. at 249.

Though the defendants bear this initial responsibility, the plaintiff as nonmoving party must then produce "specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e); see Celotex, 477 U.S. at 317. In satisfying this burden, the plaintiff must offer more than a mere "scintilla of evidence" that a genuine issue of material fact exists, Anderson, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the plaintiff must produce evidence on which a jury could reasonably find in her favor. See Anderson, 477 U.S. at 252.

In considering the defendants' motion for summary judgment, this Court construes all facts and reasonable inferences in the light most favorable to the plaintiff as nonmoving party. See Miltier v. Beorn, 869 F.2d 848 (4th Cir. 1990); Cole v.Cole, 633 F.2d 108 (4th Cir. 1980). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita, 475 U.S. at 587 (1986) (internal quotations omitted).

The defendants in the present action seek summary judgment as to the four remaining counts contained in the plaintiff's First Amended Complaint: violation of the right to freedom of speech and expression; violation of the right to equal protection of the law; violation of the right to due process of law; and violation of rights secured under the South Carolina state constitution. This Court now addresses the defendants' motion as it relates to each count in turn.

## DISCUSSION

### I. Violation of the First Amendment Right to Freedom of Speech and Expression

The plaintiff's primary allegation is that she possessed a First Amendment right to wear

6

clothing that displayed the Confederate flag to Latta Middle School and Latta High School. Plaintiff contends that by asking her to cover up or remove her Confederate flag t-shirts, and on one occasion giving her ISS for refusing to do so, the defendants violated her First and Fourteenth Amendment rights. (Am. Compl., Doc. #18).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. Freedom of speech is a significant constitutional right. The First Amendment certainly guarantees expansive rights of expression in matters of adult public discourse. Courts have recognized that in certain limited circumstances, minors attending public school do not necessarily possess the same latitude. See Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986). The United States Supreme Court has held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." Bethel, 478 U.S. at 682. Under limited circumstances, students may be prohibited from engaging in expressive conduct in school that the state could not prohibit in other contexts. See Governor Wentworth Reg. Sch. Dist. v. Hendrickson, 421 F. Supp. 2d 410, 420 (D.N.H. 2006). Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). Courts have noted that the Constitution does not compel teachers and school officials "to surrender control of the American public school system to public school students." Bethel, 478 U.S. at 682 (quoting Tinker, 393 U.S. at 526 (Black, J., dissenting)). Courts are required to examine students' alleged First Amendment violations "in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (quoting Tinker, 393 U.S. at 506).

In Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), the

7

Supreme Court addressed the constitutionality of school policies prohibiting students' rights to free expression. In this important Supreme Court decision, the plaintiff ultimately prevailed. In this case, Tinker had worn a black armband to school to protest Vietnam hostilities. He faced suspension in the absence of facts which might reasonably have led school authorities to forecast substantial disruption or a material interference with school activities when the armbands were worn. The Supreme Court held that students are generally entitled to freely express their views. Tinker, 393 U.S. 503. School officials could impose a prohibition on such speech only if "necessary to avoid material and substantial interference with schoolwork or discipline." Id. at 511. Further, the Court stated that student conduct which materially disrupts classroom work or involves substantial disorder is "not immunized by the constitutional guarantee of freedom of speech." Id. at 513. Again, notably, the Court concluded that the school officials had interfered with the student-plaintiff's constitutional rights to freedom of expression under the First Amendment.

To limit expression, school officials must possess more than a mere "undifferentiated fear or apprehension" of a future disturbance in curbing students' rights to freedom of expression. Id. at 508. Rather, school officials must demonstrate facts or evidence "which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." Id. at 514; see also Quarterman v. Byrd, 453 F.2d 54, 58 (4th Cir. 1971); Phillips v. Anderson County Sch. Dist. #5, 987 F. Supp. 488, 492 (D.S.C. 1997). Courts have not required school officials to wait until a disruption actually occurs before prohibiting the student speech in question. See Quarterman, 453 F.2d at 58; B.W.A. v. Farmington R-7 Sch. Dist., 508 F. Supp. 2d 740, 747 (E.D. Mo. 2007) (citing Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992)). School officials may take reasonable measures to prevent incidents of disorder or disruption from occurring. See,

8

e.g., Melton v. Young, 465 F.2d 1332, 1335 (6th Cir. 1972); Governor Wentworth Reg'l Sch. Dist. v. Hendrickson, 421 F. Supp. 410, 421 (D.N.H. 2006); Phillips v. Anderson County Sch. Dist., 987 F. Supp. 488, 492 (D.S.C. 1997). A critical issue in the analysis is thus whether school officials "acted on what [they] reasonably believed to be actual evidence that the shirts [bearing the confederate flag] would be disruptive." Hendrickson, 421 F. Supp. 2d at 421 (citing Castorina v. Madison County Sch. Bd., 246 F.3d 536, 545 (6th Cir. 2001) (Kennedy, J., concurring)).

The district court applied the Tinker framework in addressing the constitutionality of a school ban on Confederate flag clothing in Phillips v. Anderson County School District #5, 987 F. Supp. 488 (D.S.C. 1997). In Phillips, a school district in Anderson County, South Carolina adopted an informal policy banning Confederate clothing in response to a series of racially motivated incidents that occurred during prior school years. Id. These incidents included threats of physical violence by a group of white students towards a group of African-American students, as well as altercations between white students wearing Confederate clothing and black students. Id. at 490-91. A middle school student was suspended for refusing to remove his Confederate jacket, and subsequently sued the school district alleging violations of his First and Fourteenth Amendment rights. See id. In granting summary judgment for the school district, the district court concluded that although the plaintiff's Confederate jacket did not actually cause a disruption, school officials had satisfied the "reasonable forecast" test as defined in Tinker. Id. at 493. The school district was not required to "have waited until the Confederate flag caused yet another disruption . . . before [it] resumed its prohibition of students wearing Confederate Flag clothing." Id. (citing Quarterman v. Byrd, 453 F.2d 54, 58-59 (4th Cir. 1971)).

A number of federal courts in other circuits have addressed the constitutionality of similar

school bans on Confederate symbols utilizing the Tinker framework.  In Barr v. Lafon, 538 F.3d 554 (6th Cir. 2008), two high school students were asked to remove or cover up t-shirts bearing the Confederate flag after the school principal had verbally announced a new ban on Confederate clothing during a school assembly.  The school principal had announced the ban in response to a series of incidents of racial tension, including racist graffiti, threats of gun violence, and a physical altercation between white students and black students.  Barr, 538 F.3d at 566-67.  In affirming the district court's grant of summary judgment to school officials on the students' First Amendment claims, the Sixth Circuit noted that the Supreme Court's Tinker standard did not require that the Confederate flag itself had ever been the source of past disruption.  Id. at 565.  Even though the racial graffiti had not caused any violent disruptions, "[t]here is no requirement that disruption under Tinker be violent," thus the graffiti constituted evidence on which school officials could reasonably forecast a disruption.  Id. at 566.  In B.W.A. v. Farmington, 508 F. Supp. 2d 740 (E.D. Mo. 2007), a high school student withdrew from school after being informed he could not wear a Confederate t-shirt and belt buckle pursuant to the school's unwritten ban on Confederate symbols.  In granting summary judgment for the school district, the court held that the school district was entitled to rely on past racial incidents in enforcing its dress code policy, even if those incidents did not directly involve the Confederate flag.  Id. at 749.

In West v. Derby Unified School District No. 260, 23 F. Supp. 2d 1223 (D. Kan. 1998), aff'd, 206 F.3d 1358 (10th Cir. 2000), a middle school student was suspended for drawing a picture of a Confederate flag during class.  In dismissing the student's complaint against the school district, the court explained that "the history of racial tension in the district," consisting of at least two fights between a group of white and black students, made "administrators' and parents' concerns about

10

future substantial disruptions from possession of Confederate flag symbols at least reasonable." West, 23 F. Supp. 2d at 1232. The court noted that "[t]he fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the district was required to sit and wait for one." Id.

In Melton v. Young, 328 F. Supp. 88 (E.D. Tenn. 1971), aff'd 465 F.2d 1332 (6th Cir. 1972), school officials suspended a high school student for refusing to remove a jacket that displayed a Confederate flag patch on one sleeve. In dismissing the student's First Amendment claim, the district court noted that school officials issued the ban in response to a series of racially divisive incidents that occurred during the previous school year, including fights between black students and white students, walkouts initiated by black students during school functions, and the burning of a Confederate flag during halftime of a school football game. See Melton, 328 F. Supp. at 99. Therefore, school officials "had every right to anticipate that a tense racial situation continued to exist at [the school]." Id.

A review of these and other recent federal court decisions articulates the following relevant principles for applying the Tinker standard to a school prohibition on Confederate symbols. First, courts have allowed school officials to rely on past incidents of racial tension in anticipating a future disruption, even if those prior incidents did not directly involve the Confederate flag. See D.B. ex rel. Brogdon v. Lafon, 217 Fed. Appx. 518, 525 (6th Cir. 2007) ("nothing in Melton or Tinker requires evidence of a preexisting incident of the banned symbol evoking disruption"); B.W.A. v. Farmington R-7 Sch. Dist., 508 F. Supp. 2d 740, 749 (E.D. Mo. 2007). Second, courts have not required that prior incidents of racial tension occur during actual classroom instruction, or even on the campus of the school that the student-plaintiff attended, to support a reasonable forecast of future

11

disruption.  See, e.g., West v. Derby Unified Sch. Dist. #260, 206 F.3d 1358, 1362 (10th Cir. 2000) (holding that school officials could support a ban on Confederate symbols in part because the Ku Klux Klan had distributed flyers off-campus); Phillips v. Anderson County Sch. Dist. #5, 987 F. Supp. 488, 493 (D.S.C. 1997) ("the fact that some of the student confrontations have taken place across the street from [campus] does not eliminate them from the equation").  Third, incidents of prior racial tension need not necessarily be violent.  See Barr v. Lafon, 538 F.3d 554, 566 (6th Cir. 2008).  Fourth, the plaintiff's own conduct need not disrupt or interfere with school activities before school authorities may enforce a ban on Confederate flag clothing.  See, e.g., West 206 F.3d 1358; Farmington, 508 F. Supp. 2d at 750; Phillips, 987 F. Supp. at 491.  Furthermore, the plaintiff's personal interpretation of the Confederate flag and its meaning is "largely irrelevant" in determining whether a ban on Confederate flag clothing is constitutionally permissible.  Farmington, 508 F. Supp. 2d at 749.  Finally, school officials need not prove conclusively that the prior incidents on which they justified the ban were, in fact, racially motivated so long as they had reasonable evidence from which to anticipate a future disruption.  See Farmington, 508 F. Supp. 2d at 750; see also Scott, 324 F.3d at 1249 (holding that a ban on Confederate symbols was constitutional where school officials presented testimony of fights "which appeared to be racially based").

Notably, there are cases that reach a contrary result.  A ban on Confederate flag clothing may not be constitutional where school officials cannot show "flag-based physical violence between students, a pervasive background of demonstrated racial hostility, or the involvement of any hate groups aligned on either side of a serious racial divide," Bragg v. Swanson, 371 F. Supp. 2d 814, 827 (W.D.W. Va. 2005), or where a genuine issue of fact exists as to whether any prior incidents of disruption on which the school based its policy were racially motivated.  See Castorina v. Madison

County Sch. Bd., 246 F.3d 536, 542 (6th Cir. 2001).  But see Castorina, 246 F.3d at 545 (Kennedy, J., concurring) ("The critical issue, however, is whether the principal acted on what he reasonably believed to be actual evidence that the [Confederate] shirts would be disruptive").  Furthermore, a school official may not simply transfer a ban on Confederate flag clothing from one school to another based solely on racial incidents that occurred at another school.  See Bragg, 371 F. Supp. 2d at 827.

In addition to the cases cited and discussed above, this Court has reviewed the following cases in considering the defendants' motion for summary judgment in the present action.  Morse v. Frederick, 551 U.S. 393 (2007);  Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988); Newsom v. Albermarle County Sch. Bd., 354 F.3d 249 (4th Cir. 2003); Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243 (3d Cir. 2002); Denno v. Sch. Bd. of Volusia County, 218 F.3d 1267 (11th Cir. 2000); Chandler v. McMinnville Sch. Dist., 978 F.2d 524 (9th Cir. 1992).

In its present motion for summary judgment, the defendants contend that they possessed sufficient facts and evidence regarding previous incidents of racial tension in Latta School District on which to reasonably forecast that allowing Confederate flag clothing would likely cause substantial disruption of school activities.  (Doc. #120).  Defendants assert that individual defendants Liebenrood and Heyward acted appropriately when they asked the plaintiff to cover up or remove her Confederate flag t-shirts and, in one instance, gave her ISS for refusing to do so.  Defendants thus maintain that the Latta School District's unwritten ban on Confederate flag clothing did not violate the plaintiff's First Amendment right to freedom of speech and expression.

In response, the plaintiff contends that prior incidents of racial tension on which Latta School District officials based the ban on Confederate flag clothing occurred too long before the plaintiff's own conduct to support a reasonable forecast of future disruptions.  (Doc. #134).  Additionally, the

13

plaintiff argues that no actual classroom disruption ever occurred at either Latta Middle or Latta High School when she herself wore Confederate flag clothing. Therefore, plaintiff contends that summary judgment as to her First Amendment claim is inappropriate because her display of Confederate flag clothing was passive and not disruptive of school activities.

Turning to the specific facts at issue, the record in this case shows a history of racial tension in the Latta School District as outlined in the record. Prior to the 1970-71 school year, schools within the Latta School District were racially segregated. (Legette Aff. 1). Until the mid-1980s, Latta High School held two prom dances, one for black students and one for white students, and crowned a black and a white homecoming queen separately. (Liebenrood Dep. 15:22-16:3); see also (Kirby Aff. 2). The eventual integration of Latta High School's prom caused both all-white and all-black student groups to form in protest. Members of the all-black student group burned "u" symbols into their forearms and wore Malcolm X t-shirts to school, while members of the all-white student group wore clothing bearing the Confederate flag. (Kirby Aff. 2-3). The two groups engaged in multiple physical altercations with one another. (Kirby Aff. 3). In the early 1990s, a white student incited tension and hostility at Latta High School by displaying a large Confederate flag on his automobile while driving it through the school parking lot. (Liebenrood Dep. 17:13-20). Around this time, a middle school in the district experienced a series of fights between black students and white students that ultimately required police intervention.[4] (Liebenrood Dep. 16:14-25). In 1996 or 1997, several historically black churches in Dillon County burned down, and two white Latta High School students were ultimately convicted of burning down one of the churches. (Liebenrood Dep.

---

[4] It appears from the testimony that these fights occurred at a former location of Latta Middle School prior to a relocation of the school to its current location.

18:1-6). Latta High School also experienced classroom disruption and heightened tension as a result of the controversy surrounding the Confederate flag which previously flew over the dome of the South Carolina State House. (Liebenrood Dep. 18:7-22). During the 2003-04 school year, defendant Heyward recalls at least one classroom disruption at Latta Middle School that apparently involved the Confederate flag. (Heyward Dep. 33:14-24).

Students and officials of Latta School District testified to noticeable racially-motivated tension as a result of these incidents during the time plaintiff attended. Defendant Heyward stated that allowing Confederate flag clothing would "definitely lead to violence if its not controlled," and that "people are angered whenever that flag is displayed." (Heyward Dep. 62:20-63:1). Defendant Heyward testified that the reason for the ban was to "avoid . . . disruption." (Heyward Dep. 41:3-8). Defendant Heyward further stated that "there continues to be that divide" between blacks and whites in Dillon County, (Heyward Dep. 53:8-15), and that "the Confederate flag is definitely a divisive symbol between races and the community." (Heyward Dep. 62:12-14). Defendant Liebenrood stated that since arriving at Latta High School in 1980, there has always been "an unacceptable level" of racial tension at the school. (Liebenrood Dep. 28:18-24). Betty Jo Johnson, chairman of the Defendant Latta School Board, stated that although there are fewer racial incidents in Latta schools compared to the 1971 when they were still segregated, there are "still some incidents" and "still problems" concerning racial tension. (Johnson Dep. 23:22-24:10). The former president of the student body of Latta High School, an African-American, stated that the students "get offended" by the Confederate flag and that fights and turmoil will result if Confederate flag clothing were allowed. (Williams Aff. 2). Another African-American student stated that if Confederate flag clothing were permitted, the school would suffer "disruptions and inevitable altercations." (Hamlin Aff. 2).

15

To refute the defendants' evidence, the plaintiff relies largely on the disciplinary records for Latta Middle School and Latta High School for the years 2004 through 2006. (Pl.'s Ex. B1-B4, Doc. #134). The plaintiff points out that the only disciplinary records referencing the Confederate flag for the years leading up to the filing of this action involve the plaintiff. However, the disciplinary records do reflect instances of racial tensions. In addition, the disciplinary records provide a limited view into the facts and circumstances, which have been entered into the record, which prompted the school officials to enforce a ban against Confederate symbols at Latta High School and Latta Middle School. While the Court has fully considered the documentation submitted by the plaintiff, the disciplinary records do not refute the evidence introduced by the defendants.

This Court concludes that, in light of the caselaw, to restrict a constitutional right related to speech, school officials are required to meet a high burden. The Tinker decision, a case in which the student prevailed, sets a clear, specific requirement that school officials must meet in order to limit a student's constitutional right of free speech. The courts addressing free speech limitations have carefully considered the facts of each case, clearly aware that a significant individual right is at issue. Indeed, significant constitutional rights are at issue in the present case. As outlined in the record, given the overall context of past and present hostility and tension which has occurred over a broad spectrum of time between African-American and Caucasian students in the Latta School District, this Court concludes that Latta School District officials could have reasonably concluded that permitting the plaintiff to wear Confederate flag t-shirts would likely result in a substantial disruption of or material interference with school activities. See Governor Wentworth Reg. Sch. Dist. v. Hendrickson, 421 F. Supp. 2d 410, 423 (D.N.H. 2006). As detailed above, the defendants have introduced evidence of incidents of racially-motivated tension, altercations, and disruptions

16

occurring at both Latta Middle School and Latta High School, many of which involved the Confederate flag. Given this background, the defendants are not required, according to caselaw, to wait until a racially-motivated disruption occurs before enforcing the restriction on Confederate symbols against the plaintiff. See Quarterman v. Byrd, 453 F.2d 54, 58 (1971). This Court concludes that the defendants have met their high burden of providing sufficient facts and evidence which support a reasonable forecast that a ban on Confederate flag clothing was necessary to prevent disruption or interference with school activities. See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969).

This Court, after careful consideration of the caselaw and evidence of record, concludes the defendants acted reasonably in enforcing the restriction at issue. Prior racial incidents and disruptions occurred in the past and remain extant. Testimony of students and administrators shows that tension existed between black and white students at Latta Middle and High School during the time the plaintiff attended, including at least one classroom disruption concerning the Confederate flag. (Heyward Dep. 33:14-24). Further, evidence in the record shows that the tensions within the school district continue, as the defendants have introduced evidence of certain recent racial tensions. During the spring of 2009, Latta Middle School experienced discipline problems after white students apparently issued racial slurs against black students. (Heyward Dep. 51:21-52:5). Two racially-motivated incidents also occurred at Latta High School during the 2009 spring semester. In the first, defendant Liebenrood suspended a white student for telling racial jokes in class on belief that, had he not intervened as school principal, a black student would have assaulted the white student for telling the joke. (Libenrood Dep. 18:25-19:11). In the second, a group of students threatened a white student who wore a Confederate belt buckle to school. (Liebenrood Dep. 19:12-16). While

these incidents had not taken place at the time that the ban was enforced against the plaintiff, the incidents reflect the fact that the racial tensions within the school are not confined solely to the past.

For these reasons, based on the evidence of record, this Court does not find that the defendants acted with an "undifferentiated fear or apprehension of disturbance" or "a mere desire to avoid . . . discomfort or unpleasantness" when they enforced the ban against the plaintiff with regard to the Confederate flag. Tinker, 393 U.S. at 508. See generally Barr v. Lafon, 538 F.3d 554, 565 (6th Cir. 2008) (quoting D.B. Brogdon v. Lafon, 217 Fed. Appx. 518, 525 (6th Cir. 2007)) (noting that federal appellate court decisions since Tinker have focused on "whether the banned conduct would likely trigger disturbances such as those experienced in the past").

The plaintiff's citation to Castorina v. Madison County School Board., 246 F.3d 536 (6th Cir. 2001), in support of her contention that the ban was unconstitutional because no disruption ever occurred when she herself wore Confederate flag t-shirts is not a basis to conclude that school officials acted unreasonably in banning Confederate flag clothing. A plaintiff's own conduct need not necessarily result in a disruption before a school can reasonably forecast that a policy would prevent likely disruption. See Philips v. Anderson County Sch. Dist #5, 987 F.Supp. 488, 493 (D.S.C. 1997); West v. Derby Unified Sch. Dist. #260, 206 F.3d 1358 (10th Cir. 2000); B.W.A. v. Farmington R-7 Sch. Dist., 508 F. Supp. 2d 740, 750 (E.D. Mo. 2007).

Again, the defendants are required to meet a high burden in restricting free speech. After careful examination of the facts, evidence, and arguments submitted by the parties, this Court concludes that the defendants possessed substantial facts which reasonably supported a forecast that Confederate flag clothing would likely disrupt the educational environment of the schools within the Latta School District. It was therefore reasonable for the defendants to conclude, under the

18

circumstances, that if the plaintiff were permitted to wear Confederate flag t-shirts, further tension, discord, and disruptions would occur, thus interfering with school activities.  See Governor Wentworth Reg. Sch. Dist. v. Hendrickson, 421 F. Supp. 2d 410, 424 (D.N.H. 2006).  Therefore, the defendants are entitled to summary judgment as to the plaintiff's First Amendment claim.

## II.  Fourteenth Amendment Right to Equal Protection of the Law

The plaintiff next contends that the defendants violated her Fourteenth Amendment right to equal protection of the law by selectively enforcing the dress code.  Specifically, plaintiff asserts that Latta High School officials "turned a blind eye" to male students who wore their pants "so low that their underwear is exposed" as well as students who wore "racially and ethnically provocative symbols," including: FUBU (For Us By Us), Baby Phat; Gang tees; "Black power;" Malcolm X; Black Pride Homeland; Gay Pride; "Gay by Nature and Absolutely Fabulous by Choice;" Jamaican Flag; Bob Marley hats; sexually explicit shirts; illegal drugs; and alcohol.  (Pl.'s First Am. Compl ¶ 41, Doc. #18).  Relying on the Sixth Circuit's holding in Castorina v. Madison County School Board, 246 F.3d 536 (6th Cir. 2001), the plaintiff maintains that by not disciplining students for wearing clothing displaying these images, the defendants violated her Fourteenth Amendment right to equal protection of the law.

The equal protection clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 2.  Generally, the Fourteenth Amendment mandates similar treatment under the law for those who are similarly situated.  Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1214 (5th Cir. 1991); see also Lunini v. Grayeb, 395 F.3d 761, 769 n. 5 (7th Cir. 2005).  An equal protection claim within the First Amendment context requires "essentially the same analysis" as

19

conducted above in regards to the plaintiff's First Amendment claim.  Barr v. Lafon, 538 F.3d 554, 575 (6th Cir. 2008); see R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 384 n. 4 (1992) (noting that the Supreme Court "has occasionally fused the First Amendment into the Equal Protection Clause . . . with the acknowledgment that the First Amendment underlies its analysis").  Indeed, equal protection claims are often "closely intertwined with First Amendment interests" in many situations. See Police Dep't. Of Chicago v. Mosley, 408 U.S. 92, 95 (1972) (holding that a no-picketing law that contained an exception for labor-related picketing violated the equal protection clause as a targeted restriction of expression under the First Amendment).

In the present action, the plaintiff does not apparently allege that the school dress code was not "[narrowly] tailored to serve a substantial government interest," Mosley, 408 U.S. at 99, but argues that school officials enforced the dress code in a viewpoint-discriminatory manner.  (Am. Compl., Doc. #18).  Relatively few federal courts have examined school dress codes for possible viewpoint discrimination within the broader context of First Amendment freedoms of speech and expression.  See, e.g., Barr v. Lafon, 538 F.3d 554 (6th Cir. 2008); D.B. Brogdon v. Lafon, 217 Fed. Appx. 518 (6th Cir. 2007); Castorina v. Madison County Sch. Bd., 246 F.3d 536 (6th Cir. 2001); see also Phillips v. Anderson County Sch. Dist. #5, 987 F. Supp. 488 (D.S.C. 1997).  Under this line of precedent, the relevant inquiry is whether the plaintiff has created a genuine issue of material fact regarding whether school officials enforced the dress code in an unequal and discriminatory manner by targeting Confederate flag symbols but not other racially-divisive symbols.  See Castorina, 246 F.3d at 542 ("[a] school board cannot single out Confederate flags for special treatment while allowing other controversial racial and political symbols to be displayed"); Barr, 538 F.3d at 571 (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 511 (1969) (noting that in the

20

Sixth Circuit, a school dress code must be consistent both with Tinker and Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819 (1995), which held that a university that had opened a limited public forum could not then discriminate on the basis of viewpoint); see also Griggs ex rel. Griggs v. Fort Wayne Sch. Bd., 359 F. Supp. 2d 731, 748 (N.D. Ind. 2005).  After a careful examination of the evidence, affidavits, testimony, and arguments presented by the parties, this Court concludes that Latta School District's ban on Confederate flag clothing was not enforced in a viewpoint-discriminatory manner so as to violate the plaintiff's Fourteenth Amendment right to equal protection of the law.

In Castorina v. Madison County School Board, 246 F.3d 536, 538 (6th Cir. 2001), a high school student was suspended for wearing a Confederate flag t-shirt pursuant to a written dress code that banned clothing "contain[ing] slogans . . . [with] any illegal, immoral, or racist implication." In challenging his suspension, the student alleged that school officials had selectively enforced the dress code against Confederate flag clothing but not Malcolm X-inspired clothing.  Id. at 541.  In reversing a grant of summary judgment to the school board, the Sixth Circuit held that absent any formal factual findings, genuine issues of fact existed as to whether the school enforced its facially neutral dress code policy "in a content-specific manner" so as to deprive the plaintiff of his Fourteenth Amendment rights.  Id. at 542.

A review of the opinions analyzing school officials' enforcement of dress codes for possible equal protection violations since Castorina establishes that to defeat the defendants' motion for summary judgment, the plaintiff is required to offer evidence that Latta School District officials enforced the dress code in a discriminatory and unequal manner.  In Barr v. Lafon, 538 F.3d 554 (6th Cir. 2008), two high school students were suspended for wearing Confederate flag t-shirts, and

21

subsequently brought suit against the school principal alleging violations of their First and Fourteenth Amendment rights. The school's written dress code prohibited clothing which "causes disruption to the educational process," although the school principal had announced at a recent school assembly that Confederate flag clothing violated the dress code. Id. at 573. Even though the principal specifically identified only the Confederate flag at the assembly, he later testified that he enforced the dress code against all racially divisive symbols which were likely to cause disruption. See id. In affirming the grant of summary judgment to the principal on the students' equal protection claim, the court noted that the students had "produced no evidence suggesting that the school did not have a policy of applying the ban to all disruptive, racially divisive symbols and not just the Confederate flag." Id. at 574. Apart from the plaintiff's own allegations in the case that he saw other students wearing Malcolm X t-shirts, the plaintiffs did not present any evidence or testimony that school officials failed to enforce the dress code against other racially divisive symbols to contradict the defendant's testimony that other flags and symbols would fall under the ban "if they are disruptive." Id. at 575. See also D.B. Brogdon v. Lafon, 217 Fed. Appx. 518, 524 (6th Cir. 2007) (affirming a denial of a student's motion seeking injunctive relief against selective enforcement of school dress code against Confederate symbols but not other political symbols, court held that "no such inconsistency seems inherent . . . absent proof of how frequently and conspicuously such other symbols appeared relative to . . . the Confederate battle flag"); see also Griggs ex rel. Griggs v. Fort Wayne Sch. Bd., 359 F. Supp. 2d 731, 748 (N.D. Ind. 2005) (granting summary judgment to school officials on equal protection claim where student-plaintiff failed to demonstrate any unequal treatment and presented no evidence that officials knew of other students wearing clothing depicting symbols of violence and punished the students for wearing them).

In the present action, this Court concludes that the plaintiff has not shown that a genuine issue of material fact exists as to the defendants' enforcement of the written dress code at Latta High School. School officials stated that the dress code was enforced against all racially divisive symbols, regardless of viewpoint. Betty Jo Johnson, Chairperson of the Defendant Board of Trustees of Latta School District, testified that t-shirts bearing images of or related to Malcolm X, FUBU, Baby Phat, gang tees, or "other racial symbols" were banned at all schools within the Latta School District. (Dep. Johnson 42:14-22). Larry Legette, member of the Defendant Board of Trustees of Latta School District, stated that "no racially discriminatory and/or inflammatory messages are permitted to be conveyed non-verbally on attire . . .within our schools," and that the school district's "policies and procedures have been even-handedly applied to all students." (Legette Aff. 2). Defendant Liebenrood, principal of Latta High School, stated that many racially divisive symbols, not just Confederate flags, are banned at Latta High School, including those related to Malcolm X. (Liebenrood Dep. 14:2-10). In fact, defendant Liebenrood has maintained a photographic log of all of the shirts banned from Latta High School in recent years. (Doc #55-59). The photographic log contains photos of numerous shirts depicting a wide variety of symbols and images which students have been asked to remove in accordance with the high school's dress code. Defendant Libenrood presented photographic evidence of a Malcolm X t-shirt that he had once asked a student to remove. (Doc. #58). Further, the former president of the student body at Latta High School, an African-American, stated that she believes "that the dress code at Latta High School has been enforced with an even hand." (Williams Aff. 2).

In regard to Latta Middle School, defendant Heyward notes that the plaintiff is not the first person who has been asked to remove a piece of clothing for violation of the dress code, and that the

23

students are approached in a respectful manner "regardless of whether it's, in [plaintiff]'s case, the Confederate flag, or an alcoholic symbol." (Heyward Dep. 17:4-12). Defendant Heyward further stated that "[i]f I notice something and . . . think it is violating the policy, then I'm going to address it . . . [i]f I have another student or a staff member that calls it to my attention, then I will address the problem, as well." (Heyward Dep. 27:16-20). Defendant Heyward also specifically acknowledged sagging pants as inappropriate for both male and female students. (Heyward Dep. 40:8-14). Finally, as defendant Heyward points out, there will inevitably be cases where students wear prohibited clothing but go unnoticed. However, the defendant specifically notes that "if [a violation of the dress code is] noticed, it's going to be addressed." (Heyward Dep. 48:13-16).

The evidence does not reflect that the defendants enforced the dress code in a viewpoint-discriminatory manner. The only item offered to rebut the evidence presented by the defendants is the allegations in the Amended Complaint. (Doc. #134 p. 23). Under the Federal Rules of Civil Procedure, "[w]hen a motion for summary judgment is made and supported (by affidavits), an adverse party may not rest upon the mere allegations or denials of his pleading." Fed. R. Civ. P. 56(e); see also Matney v. First Protection Life Ins., Co., 73 F.R.D. 696, 698 (W.D. Va 1977). By presenting no evidence that school officials were aware of other students who wore racially divisive symbols and thereafter, selected not to discipline them, the plaintiff has failed to make "some comparative showing of discrimination among similarly situated individuals." Griggs ex rel. Griggs v. Fort Wayne Sch. Bd., 359 F. Supp. 2d 731, 748 (N.D. Ind. 2005).

The Court also notes that the record does not support a conclusion that clothing depicting the other images outlined in the First Amended Complaint caused any disruption at Latta Middle School or Latta High School. See Phillips v. Anderson County Sch. Dist. #5, 987 F. Supp. 488, 494 (D.S.C.

1997) (granting summary judgment to the school board because the student plaintiff produced no evidence that shirts displaying certain images had ever caused disruption); see also Barr v. Lafon, 538 F.2d 554, 574 (6th Cir. 2008) (affirming summary judgment to the defendant school principal where the school had not banned the Canadian flag or other political symbols "because of an alleged absence of necessity").  For these reasons, after a review of the record, this Court does not conclude that the plaintiff has shown a violation of her Fourteenth Amendment right to equal protection of the laws.  U.S. Const. amend XIV, § 2.  Therefore, the defendants are entitled to summary judgment on this claim.

### III.  Fourteenth Amendment Right to Due Process

The Plaintiff next alleges that the defendants violated her right to due process of law as guaranteed by the Fourteenth Amendment. (Am. Compl., Doc. #18).  Specifically, plaintiff contends that Latta School District's "dress code regulations as enforced by the defendants are vague, overbroad and lack sufficient standards and safeguards to guide the discretion of school officials in enforcing them," and that school officials' personal preferences and "predilections" constitute "the principal if not sole factor" in deciding whether to discipline a student for a dress code violation. (Am. Compl. ¶ ¶ 54-55, Doc. #18).  Plaintiff maintains that this "wholly subjective scheme" by which the defendants enforced the dress codes resulted in a denial of her rights to due process of law. (Am. Compl.¶ 55, Doc. #18).

It thus appears, based on the allegations in the Amended Complaint, that the plaintiff has attempted to assert a facial challenge to the dress codes of both Latta Middle and High School; a claim wholly apart from her constitutional challenges to the defendants' specific enforcement of the dress codes against the plaintiff for her own conduct.  See B.W.A. v. Farmington R-7 Sch. Dst., 508

F. Supp. 2d 740, 750 (E.D. Mo. 2007).  A facial challenge to a law or statute "is the most difficult challenge to mount, since the challenger must establish that no set of circumstances exists under which the [law] would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  Generally, courts will not address facial challenges, instead focusing on a law's particular application against the plaintiff.  See Newsom ex rel. Newsom v. Albermarle County Sch. Bd., 354 F.3d 249, 257 (4th Cir. 2003).  However, the overbreadth doctrine of the First Amendment constitutes a departure from this traditional rule.  Id. (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)); see also Los Angeles Police Dept. v. United Reporting Publ'g Corp., 528 U.S. 32, 38 (1999) (noting that a challenge to a statute based on First Amendment overbreadth constitutes a "prototypical exception" to the traditional rule of standing).  Pursuant to this doctrine, a plaintiff may challenge a statute or policy on its face "because it also threatens others not before the court . . . who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid."  Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (citation and internal quotation marks omitted).

However, the overbreadth doctrine is not "casually employed."  Los Angeles, 528 U.S. at 39.  Because of the wide-reaching effects of striking down a statute, the United States Supreme Court has recognized the overbreadth doctrine as "strong medicine" that should be employed "with hesitation, and then only as a last resort."  Id.  Accordingly, a statute or policy should not be invalidated for overbreadth "unless it reaches a substantial number of impermissible applications," New York v. Ferber, 458 U.S. 747, 771 (1982), and the policy is not susceptible to a reasonable limiting construction that would render the policy constitutional.  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 215 (3d Cir. 2001) ("every reasonable construction must be resorted to, in order to

save a statute from unconstitutionality") (internal citations omitted).

To succeed on her claim that the dress codes were unconstitutionally vague and overbroad, the plaintiff must initially show that (1) the dress codes' overbreadth was both real and substantial when judged in relation to their "plainly legitimate sweep," and that (2) no "limiting construction" or "partial invalidation" could "remove the seeming threat or deterrence to constitutionally protected expression." Newsom, 354 F.3d at 258 (quoting Broadrick, 413 U.S. at 613). This Court will not "rewrite" the dress codes "to conform [them] to constitutional requirements." Id. (quoting Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988)). Rather, a successful overbreadth challenge by the plaintiff would "totally forbid . . . any enforcement" of the defendants' dress code at Latta Middle and High School. Broadrick, 413 U.S. at 613.

Furthermore, the overbreadth doctrine "warrants a more hesitant application in the [public school] setting than in other contexts." Newsom, 354 F.3d at 258 (quoting Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 259 (3d Cir. 2002)). School officials are not required nor expected "to employ the same level of precision in drafting school disciplinary procedures as is expected of legislative bodies crafting criminal restrictions." Sypniewski, 307 F.3d at 260. The Supreme Court has specifically recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." New Jersey v. T.L.O., 469 U.S. 325, 330 (1985). Therefore, given school officials' "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct [that is] disruptive of the educational process," school disciplinary rules and policies "need not be as detailed as a criminal code which imposes criminal sanctions." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986).

The Fourth Circuit specifically addressed the constitutionality of a school dress code

against an overbreadth challenge brought by a student plaintiff in <u>Newsom ex rel. Newsom v.</u> <u>Albermarle County School Board</u>, 354 F.3d 249 (4th Cir. 2003).  In <u>Newsom</u>, a student claimed his school's ban on "messages . . . that relate to . . . weapons" was unconstitutionally overbroad.  <u>Id.</u> at 259.  In vacating the district court's denial of the student's motion to enjoin enforcement of the ban, the Fourth Circuit reasoned that because school officials offered no evidence to demonstrate that "clothing worn by students . . . relating to weapons . . . ever substantially disrupted school operations or interfered with the rights of others," the ban was unnecessary to maintain discipline.  <u>Id.</u>  In light of the lack of evidence of any disruption or interference as a result of such clothing, the ban could "be understood as reaching lawful, nonviolent, and nonthreatening symbols." <u>Id.</u> at 259-69.  Because there was no evidence the ban was necessary to curtail disruption and because school officials apparently did not employ "any cogent limiting construction of [the dress code]," the court held that the student was likely to succeed on his overbreadth claim at trial.  <u>Id.</u> at 260.

Federal courts in other circuits have also addressed student overbreadth challenges to school dress codes.  In <u>B.W.A. v. Farmington R-7 School District</u>, 508 F. Supp. 740 (E.D. Mo. 2007), a student  alleged that a school dress code prohibiting "[d]ress that materially disrupts the educational environment" was facially overbroad after he was suspended for wearing a Confederate flag hat.  The court granted summary judgment to the defendant school district on the student's facial challenge. <u>Id.</u>  The court held that because the school district had already "fulfilled the <u>Tinker</u> substantial disruption standard" as to the student's First Amendment claim and because the language of the dress code "tracks [<u>Tinker</u>]," there was no real danger that the dress code compromised the First Amendment rights of other students.  <u>Id.</u> at 750-51; <u>see also</u> <u>Smith ex rel. Lanham v. Greene County</u> <u>Sch. Dist.</u>, 100 F. Supp. 2d 1354, 1365 (M.D. Ga. 2000) (holding that a dress code prohibiting

"offensive writing, symbols or pictures" did not present a realistic danger of compromising other students' First Amendment rights).

Likewise, in West v. Derby Unified School District No. 260, 206 F.3d 1358 (10th Cir. 2000), a student was suspended for drawing a Confederate flag during class.  The student alleged that the school's policy, which stated that "students shall not . . . wear or have in their possession any written material . . . that is racially divisive or creates ill will or hatred" was unconstitutionally vague and overbroad.  Id. at 1367.  In affirming a grant of summary judgment to the defendant school district, the Tenth Circuit held that the policy did not threaten constitutionally protected speech because there was no evidence school officials used the policy to curb speech with "legitimate educational purposes," such as in textbooks and other school materials.  Id.  Furthermore, the school officials placed unwritten limiting constructions when enforcing the policy, such as choosing to only discipline students who admitted to being aware of the policy and who admitted to intentionally violating it.  See id.  Because of these limitations, the policy was likely to "only apply in circumstances where it is constitutional to do so under Tinker and Bethel."  West v. Derby Unified Sch. Dist. No. 260, 23 F. Supp. 2d 1223, 1235 (D. Kan. 1998), aff'd, 206 F.3d 1358 (10th Cir. 2000).

Finally, the plaintiff student in Bragg v. Swanson, 371 F. Supp. 2d 814 (S.D.W. Va. 2005), challenged a school policy banning "items displaying the Rebel flag," claiming it was unconstitutionally overbroad.  In granting the student's motion for injunctive relief, the court held that the policy was overbroad because school officials could present no evidence that the policy was necessary to maintain order and discipline pursuant to Tinker.  See id. at 827.  Because there existed an "evidentiary vacuum" with regard to past incidents of racial tension involving the Confederate flag at the plaintiff's school, the ban would impermissibly reach "a variety of innocent flag uses."

29

Id.  Furthermore, the ban prohibited items displaying the Confederate flag, not just articles of clothing, meaning that a "whole host of library and instructional materials upon which the flag might be expected to appear" could be construed as prohibited under the policy.  Id. at 828.

Turning to the present case, the defendants relied upon published school policies in disciplining the plaintiff.  The applicable policy in place at Latta Middle School during the time the plaintiff attended read as follows: "[g]enerally, student dress is considered appropriate as long as it does not distract others, interfere with the instructional programs, or otherwise cause disruption. . . . [s]tudents may not wear clothing that displays profane language, drugs, tobacco, or alcohol advertisements, sexual innuendos or anything else deemed to be offensive . . . " (Am. Compl. ¶ 11, Doc. #18).  In addition, the policy applicable at Latta High School during the time that the plaintiff attended read as follows:  "[d]ress is casual, but some styles, which may be appropriate outside of school, are clearly inappropriate for school. . . . [s]tudents may not wear the following: . . . [s]hirts with obscene/derogatory sayings . . . "  (Am. Compl. ¶ 12, Doc. #18).  The plaintiff alleges that the phrases "anything else deemed to be offensive" and "shirts with obscene/derogatory sayings" are unconstitutionally vague and overbroad as enforced in Latta Middle and High School, respectively.  (Am. Compl. ¶¶ 11-12, Doc. #18).

After thoroughly examining the evidence, exhibits, affidavits, and arguments made by the parties, this Court concludes that the dress codes of Latta Middle School and Latta High School are not unconstitutionally overbroad.  As an initial matter, unlike the scenario presented in either Newsom or Bragg, the school officials in this case have met their burden of showing that the ban on Confederate flag clothing was appropriate to prevent a substantial disruption or interference with school activities.  The danger that the dress codes will be applied against wholly innocent

expressions is substantially less than in similar challenges where school officials had little to no evidence of past disruptions or incidents which might necessitate a broad policy on student dress. See, e.g., Bragg, 371 F. Supp. 2d at 827-28. Second, unlike in Bragg, the applicable language in both dress codes specifically identifies either "shirts" or "clothing," not merely "items," that might contain the symbol in question. 371 F. Supp. 2d at 828. Finally, both student dress codes contain additional, limiting language such that they are likely to be enforced only when constitutional to do so under either Tinker or Bethel. See West, 23 F. Supp. 2d at 1235. Specifically, the Latta Middle School dress code prohibits clothing that "distract[s] others, interfere[s] with the instructional programs, or otherwise cause[s] disruption," and specifically lists "anything deemed to be offensive" as an *example* of the type of distracting, interfering, or disrupting clothing banned under the dress code. (Am. Compl. ¶ 11, Doc. #18). Because the dress code is written to target only clothing that causes disruption or interference in accordance with the standard set forth in Tinker, the Court does not find the dress code legally overbroad. See id.; see also B.W.A., 508 F. Supp. at 750-51 (holding that a dress code containing language that "tracks Tinker" does not pose a real danger of reaching a substantial amount of constitutionally protected speech). By prohibiting "shirts with obscene/derogatory sayings," the Latta High School dress code is sufficiently narrow. See Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986) (holding that a student's suspension for violating a school disciplinary rule which proscribed 'obscene' language did not violate his right to due process when combined with the student's own knowledge of the rule). For these reasons, this Court does not conclude that the plaintiff has sufficiently shown that the dress codes of Latta Middle and High School were unconstitutionally overbroad. To the extent that the plaintiff's claims can be construed as an as-applied challenge to the dress codes, this claim also fails for the above noted

31

reasons.

Finally, this Court concludes that the plaintiff did not lack adequate notice of the ban on Confederate clothing so as to render either dress code unconstitutionally vague. A government regulation may be declared unconstitutionally void for vagueness if it fails to give a person adequate warning that his conduct is prohibited, or if it fails to set out adequate standards to prevent arbitrary and discriminatory enforcement. See West, 23 F. Supp. 2d at 1235 (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)). In the public school context, a school policy or disciplinary rule might be void for vagueness if a reasonable student of ordinary intelligence who read the policy could not understand what conduct it prohibited. See Broadrick v. Oklahoma, 413 U.S. 601, 608 (1973). In her deposition, the plaintiff admitted she was aware of the school district's ban on Confederate flag clothing in February of 2004 while she attended Latta Middle School. (Pl.'s Dep. 72:10-16). Further, the allegations in the Amended Complaint indicate that the plaintiff was asked to remove shirts depicting the Confederate flag on numerous occasions before finally being disciplined for failing to comply with a request to remove a t-shirt depicting the Confederate flag. (Am. Compl. ¶ ¶ 16-21, Doc. #18). Thus, the record illustrates that the plaintiff had notice that the Middle School's dress code applied to Confederate flag clothing before any disciplinary action was taken against the plaintiff. Courts have noted that "[s]uch a state of mind is inconsistent with any claim that the policy did not give plaintiff fair warning that [her] conduct was prohibited." West, 23 F. Supp. 2d at 1235; see also Bethel, 478 U.S. at 686 (noting that a teacher's verbal warning gave a student adequate notice of how a school ban on "obscene language" would be enforced). The Court concludes that the applicable dress codes put students on notice of what was prohibited. See Broadrick, 413 U.S. at 608. School officials are entitled to a "certain degree of flexibility" in enforcing policies that

discipline "a wide range of unanticipated conduct," and school disciplinary rules "need not be as detailed as a criminal code." Bethel, 478 U.S. at 686. The record reflects that the dress codes, as enforced, were neither facially overbroad under the First Amendment nor unconstitutionally vague. Therefore, the defendants are entitled to summary judgment as to this claim.

### IV. Claims Arising Under the South Carolina Constitution

In her final ground, the plaintiff alleges that the defendants violated her rights to freedom of speech and expression pursuant to the South Carolina Constitution. (Am. Compl., Doc. #18). The parties have identified no precedent suggesting that the South Carolina Constitution affords "broader protections in the area of public student free speech than the United States Constitution." Governor Wentworth Reg. Sch. Dist., 421 F. Supp. 2d 410, 425 (D.N.H. 2006). Because the defendants are entitled to summary judgment on the plaintiff's First and Fourteenth Amendment claims under the United States Constitution, the defendants are likewise entitled to summary judgment as to the plaintiff's claim under the South Carolina Constitution.

### CONCLUSION

For the reasons set forth herein, the defendants' motion for summary judgment is **GRANTED**. (Doc. #120).

**IT IS SO ORDERED**.

    s/ Terry L. Wooten
United States District Judge

September 8, 2009
Florence, South Carolina

33